[Civ. No. 45439. First Dist., Div. Four. Oct. 19, 1979.]

ESMAEL P. VELASQUEZ, Plaintiff and Appellant, v.
FIBREBOARD PAPER PRODUCTS CORPORATION et al.,
Defendants and Respondents.

**COUNSEL**

Halley, Cornell & Lynch, J. Kenneth Lynch, Frederick A. Patterson, McCarthy, Johnson & Miller and James E. Miller for Plaintiff and Appellant.

Berry & Berry, John M. Ingle, McCutchen, Doyle, Brown & Enersen, William H. Armstrong, Richard C. Brautigam and Marilee Allan Wilson for Defendants and Respondents.

## OPINION

POCHÉ, J.—Esmael P. Velasquez suffers from asbestosis, a progressive lung disease which he contends is the responsibility of respondents. His appeal is from a summary judgment which determined that he filed his claims sounding in negligence and strict liability too late to satisfy the applicable one-year statute of limitations. (Code Civ. Proc., § 340, subd. 3.)

The court below proceeded to summary judgment on a stipulated statement of facts which we will summarize. Velasquez is a man of at least normal intelligence who understands the English language but cannot read or write it. He worked as an insulator with asbestos products for more than 30 years, until January of 1974, when he became disabled by asbestosis, a form of pulmonary fibrosis often caused by exposure to asbestos fibers and dust on the job. Asbestosis, which is characterized by pleural thickening, reduced elasticity of lung tissue, reduced total lung volume and reduced ability to transfer oxygen, is commonly progressive. It may be detected before there has been significant respiratory impairment. Impairment itself does not immediately cause either a partial or total inability to work.

Appellant has had radiological findings since 1965, which revealed pulmonary fibrosis compatible with asbestosis. In 1967, he was examined by Doctors Tabershaw/Cooper and Associates, who, under grants from the United States Public Health Service, the Asbestos Workers' Union and the Asbestos Manufacturing Association, conducted periodic examinations of members of appellant's union local in San Francisco. Tabershaw/Cooper compared appellant's chest films with others on file since 1957 and found a definite progression of bilateral changes in the lungs. These doctors also found appellant's "forced vital capacity" to be 73 percent of that predicted for a man of his age and height, 80 percent being the low range of normal. Tabershaw/Cooper's habit and custom at the time would have been to advise appellant that his examination results were consistent with asbestosis. Velasquez does not recall when the doctors first informed him that he had the disease, but believes that they told him of it in 1971, if not earlier.

In 1971, for the first time, Tabershaw/Cooper made an unequivocal diagnosis of moderately severe asbestosis, based upon the following: "Cough in the a.m.; depressed respiratory function; rales; fibrosis; slight clubbing of the fingers; shortness of breath on exertion." Tabershaw/

Cooper advised appellant that he had "some impairment in his chest; that he had indications of asbestosis," and that it was their habit and custom to explain the nature of the disease. Appellant at this time was "feeling good" and did not begin to feel discomfort in his chest until 1973.

Following the 1971 examination, Tabershaw/Cooper informed appellant's personal physician by letter that his patient "shows the classic signs and symptoms of moderately advanced asbestosis." Noting that there had been minimal progression "over the past few years," they reported to appellant's doctor that they had "informed him [Velasquez] that his glucose was slightly elevated and that his EKG showed some abnormality by computer analysis. He was urged to continue work, to minimize dust inhalation at work as much as possible," and to continue under the care of his personal physician. The doctors testified that at that time appellant was not disabled and was not so impaired as to be eligible for Social Security or workers' compensation benefits.

In March 1973, complaining of "mild exertional shortness of breath," Velasquez went to Permanente Medical Group for multiphasic examination. Two months later, followup tests revealed "positive findings" of asbestosis. Tabershaw/Cooper reexamined appellant in November 1973, found basilar rales bilaterally and a continued progression of the disease. Velasquez complained of shortness of breath and of tiring easily. Tabershaw/Cooper then recommended that Velasquez "get out of the insulation trade in view of increasing impairment of pulmonary function, development of symptoms, and inability to wear a respirator."

Velasquez worked until January 7, 1974, when disability prevented him from continuing at his job. In October 1974, he filed suit against respondents, manufacturers and distributors of asbestos products, on both negligence and strict (products) liability theories. The date of filing suit is within one year of both the 1973 Tabershaw/Cooper examination when Velasquez complained of symptoms and was advised to retire from the trade, and of the date of disability and retirement itself. However, respondents persuaded the trial court that the statute began to run in 1971 upon discovery of the job-related injury, and that the action was thus time-barred under the one-year limit imposed by Code of Civil Procedure section 340, subdivision 3.

Code of Civil Procedure section 312 provides that the period of limitations begins to run on the date on which the cause of action accrues.

Case law defines such accrual as that time when the aggrieved party is entitled to begin to prosecute an action on his claim. (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 596 [83 Cal.Rptr. 418, 463 P.2d 770].) Where there is no single, alleged wrongful act but instead a period of exposure which results in a creeping disease the problem of determining when a cause of action accrues is acutely difficult. Unlike the situation where a plaintiff is run over by a truck, the plaintiff may be unaware of his rights until his injury is apparent or until diagnosis brings home to him the fact that there has been a "wrongful act." With asbestosis, no specific date of contact with fibers and dust can be pinpointed as the date of the injury because the consequences are the product of exposure over a considerable period of time.

In occupational disability cases the courts have exhibited flexibility to avoid a strict accrual rule that would otherwise bar recovery by claimants disabled by injuries of which they were unaware. (See *Warrington* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 564, 566-568 [80 Cal.Rptr. 130].) Occupational silicosis, for example, presented an early parallel to the asbestosis with which the present case is concerned. In such situations the point when the effects of the disease become "manifest" has been taken to be the time of disability. (See *Urie* v. *Thompson* (1949) 337 U.S. 163 [93 L.Ed. 1282, 69 S.Ct. 1018, 11 A.L.R.2d 252]; *Marsh* v. *Industrial Acc. Com.* (1933) 217 Cal. 338, 351 [18 P.2d 933, 86 A.L.R. 563].) But the silicosis cases provide little aid in deciding the problem before us because they involve the concurrence of disability with the eruption of symptoms unlike the situation here where a period of years intervened. Additionally, the fulcrum of these decisions is a finding of "disability" for the obvious reason that they involve actions that are akin to what we now characterize as "workers' compensation" cases rather than what is before us: claims founded on negligence or strict (i.e., products) liability.

We then turn for guidance to Federal Employers' Liability Act decisions which at least eliminate the latter problem inasmuch as a finding of employer negligence rather than merely employee disability is a precondition to relief. One such case, *Coots* v. *Southern Pacific Co.* (1958) 49 Cal.2d 805 [322 P.2d 460], involved a gradual infliction of skin injuries from exposure to a cyanide solution, injuries that the employee detected before they were severe, so that manifestation of injury occurred *before* disability. Noting that it was more reasonable to regard disability as the starting point in a compensation case than in a suit for negligent wrongdoing, the court observed that if disability is " 'approximately coincident with manifestation of the disease' " the disability standard of

accrual may still be appropriate in an ordinary tort action. (*Id.,* at p. 810.) The court did not actually decide when the statute began to run in *Coots,* because it found that the time when Coots' condition began to get "real worse" and the time of disability both fell within the statutory period. But that view, as Justice Spence points out, "necessarily holds that the statute did not commence to run in this case at the time of the first minor manifestation of plaintiff's dermatitis . . . ." (*Id.,* at p. 810.)

Justice Spence's concurrence suggests to appellant here a "substantial harm" rule for accrual, under which Velasquez' shortness of breath and examination results before 1973 are insufficient to be "actionable" injuries that would set the statute running. This substantial harm rule is proposed as an alternative to the appellant's position that the injury did not accrue until disability. Neither rule should be applied in this case.

We assume that the Supreme Court in *Coots* meant what it said about the general inapplicability of a disability standard to ordinary tort actions except where disability occurs at about the same time that the disease otherwise makes itself known. Even without the guidance of *Coots* it is obvious that the complaint before the trial court involves neither a workers' compensation claim nor a situation in which the plaintiff is unaware of injury until his symptoms become so severe that he becomes disabled. Because diagnosis here preceded both disability and impairment, the date of disability does not resolve the key question: at what point should appellant have been put on notice that his rights had been invaded? In this peculiar factual situation the date of disability is irrelevant.

Appellant's alternative, the substantial harm criterion proposed by Justice Spence, has initial appeal in cases involving gradual effects of a latent or progressive disease. Such situations can be likened to a warm bath that heats up so imperceptibly that you don't know when to scream. At times the facts may require the application of this standard to determine when the plaintiff reasonably became aware that the defendant had caused injury. For example, in *Coots,* the court was unwilling to pinpoint that awareness at the initial onset of temporary pimples on the plaintiff's hands which occurred at the first exposure to the cyanide solution, but instead treated as the significant time, the period when the symptoms became, in the plaintiff's terms, "real worse."

Except in such rare situations, the difficulties with the substantial harm test outweigh its usefulness. Because it is extremely difficult to determine

when sufficient injury has occurred its application involves intricate and unpredictable factual evaluations. It ignores the fact that an unambiguous diagnosis could put a plaintiff on notice much earlier than the appearance of really debilitating effects, and it flies in the face of the policy of repose which inheres in the statute of limitations because this test involves precisely the evils of stale claims and forgotten evidence which the statute was designed to combat.[1]

Accordingly, we reject the applicability to the facts of this case of both tests suggested by appellant: disability and substantial injury. However, that does not solve the problem of determining when the one-year statute began to tick where there is no single act or event which can be pointed to as the moment of injury.

Respondents suggest a discovery standard, based upon *Anderson v. Southern Pac. Co.* (1964) 231 Cal.App.2d 233 [41 Cal.Rptr. 743]. There an employee sought recovery under the Federal Employers' Liability Act for pulmonary emphysema caused by dust inhalation on the job. Although he had suffered some shortness of breath, coughing and stomach trouble beginning in 1956, plaintiff was not diagnosed as having occupational emphysema until 1959. The court found that there was nothing in the record from which the jury could find that "plaintiff either knew, or in the exercise of ordinary care should have known, that he was suffering from pulmonary emphysema or any disease occupationally contracted and either disabling or probably disabling." (*Id.*, at p. 244.) This discovery rule has also been applied to products liability cases where the adverse effects of drugs did not immediately become known. (See *Warrington v. Charles Pfizer & Co., supra,* 274 Cal.App.2d 564, and *G. D. Searle & Co. v. Superior Court* (1975) 49 Cal.App.3d 22 [122 Cal.Rptr. 218], for application of precisely this.) Appellant correctly points out that in those cases, unlike the case at bar, the plaintiff suffered injury before knowing what the cause of it was. But this does not suggest why the discovery rule should not be applied in the novel situation before us where the plaintiff learns of the occupationally related disease before knowingly suffering its severe effects.

■ We agree that in a negligence or strict liability action, discovery is the appropriate test for determining accrual of a cause of action for a progressive disease. The question is what did the plaintiff know and when

---

[1]Compare the legal and medical malpractice actions, where the statute may be tolled until appreciable injury but even then only for a limited time. (Code Civ. Proc., §§ 340.5, 340.6; *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 201 [98 Cal.Rptr. 849, 491 P.2d 433].)

did he know it. When did he know or when should he have discovered that he was suffering from a disease that had caused or was likely to cause him injury for which relief could be sought at law. Logically, such knowledge might come as well from an early diagnosis of a latent disorder as from an experience of pain or disability of an active disorder.

It remains to apply the rule to this case. Since it is a summary judgment which is the subject of this appeal the test under Code of Civil Procedure section 437c is whether triable issues of fact exist in the stipulated facts which alone formed the basis of the cross-motions.

Respondents argue that the appellant may be said to have discovered his injury by the *diagnosis,* in 1971 if not before, *of indications of* *asbestosis* by Tabershaw/Cooper. Appellant had heard of asbestosis in 1957 and was aware that it might be hazardous to health. In 1971, Tabershaw/Cooper told him that he had "indications of asbestosis." The doctors also wrote to his personal physician (and the agreed facts do not reveal what, if anything, of this letter was subsequently communicated to Velasquez) that Velasquez had "classic signs" of the disease with "minimal progression" over a period of years, and that they had informed him that his "glucose was slightly elevated and that his EKG showed some abnormality by computer analysis." This is all that Tabershaw/Cooper testified to communicating to appellant at the 1971 examination. They believe that it was their "habit and custom" to explain the nature of the disease to patients in whom they found indications, but we do not know if this was done in Velasquez' case. The stipulated facts give cause to question whether appellant was informed that he had a progressive and serious disorder which would cause him pain and debility in the future. He had not, after all, sought medical advice for a physical complaint; rather, he had been asked to be examined as one of many union members being tested in a joint employer/union study. What would he reasonably understand on the basis of hearing that his glucose was slightly elevated, that his EKG showed "some abnormality" by computer analysis and that he had "indications of asbestosis?" Did he know that the condition was worsening, that it would in the future involve pain and impairment although it did not at present? In fact, Tabershaw/Cooper wrote his physician that Velasquez was "urged to continue work," and despite the letter to the doctor, there was no further testing until 1973. Under the peculiar circumstances of this case, it is not at all clear that diagnosis is synonymous with discovery.

What must be sought where diagnosis is meant to be the essence of discovery is an "informed diagnosis" roughly parallel to "informed

consent" in medical malpractice or battery actions. (See *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1].) One commentator has defined this as an obligation, in rendering medical treatment, "to see to it that the patient-subject has understood this information to the degree that he or she is capable of such understanding." (Riga, *Informed Consent* (1977) 10 Lincoln L.Rev. 159, at p. 172, citing *Cobbs and Canterbury* v. *Spence* (D.C. Cir. 1972) 464 F.2d 772, cert. den., 409 U.S. 1064 [34 L.Ed.2d 518, 93 S.Ct. 560].) A brief explanation of findings and prognosis by the examining physician is necessary before it can be asserted that the patient has "discovered" a latent or progressive disorder which has not, in all those years of exposure, caused noticeable harm. Where the physical manifestations have not yet occurred, discovery must mean a reasonable knowledge that they are likely to occur. The slender record of agreed facts upon which this summary judgment rests does not afford an adequate basis for ascertaining whether appellant was reasonably made aware of impending injury.[2]

Tabershaw/Cooper's "habit and custom" to advise an examinee such as appellant that examination results were consistent with asbestosis is not sufficient because it leaves to conjecture: (a) whether in fact the habit and custom were actually followed in appellant's examination, and (b) whether that advice if given met the standards of informed diagnosis set forth in this opinion.

These matters are important triable issues of fact which go to the essence of the discovery test for accrual of a cause of action.

The judgment is reversed and the cause is remanded to the trial court for further disposition in accordance with the views expressed herein.

Caldecott, P. J., and Rattigan, J., concurred.

---

[2]Counsel have argued the interesting question whether this court ought to construe the facts against the prevailing party in reviewing a summary judgment based upon a stipulated set of *agreed* facts where the parties have made cross-motions for summary judgment. We do not reach this issue because the agreed statement of facts, with or without such constructions, does not offer sufficient evidence of the nature of the information communicated by Tabershaw/Cooper or by Velasquez' private physician to draw a conclusion as to Velasquez' reasonable knowledge of prospective injury, and the facts and interpretations of physical manifestations are controverted.